# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF MISSISSIPPI

**JAMES EVERETT DUTSCHKE**                                                **PETITIONER**

**V.**                                                **1:13-CR-00081-SA-DAS**

**UNITED STATES OF AMERICA**                                                **RESPONDENT**

### GOVERNMENT'S RESPONSE TO MOTION UNDER 28 U.S.C. § 2255 TO VACATE, SET ASIDE, OR CORRECT SENTENCE BY A PERSON IN FEDERAAL CUSTODY

**COMES NOW** the United States of America, by and through Felicia C. Adams, United States Attorney for the Northern District of Mississippi, and files its response in opposition to the petitioner's motion filed pursuant to 28 U.S.C. § 2255, and in support thereof would state as follows:

## I. FACTUAL AND PROCEDURAL HISTORY

Petitioner James Everett Dutschke was arrested on April 27, 2013, on a criminal complaint charging him with possessing and using ricin in violation of 18 U.S.C. § 175(a) (Prohibitions with regard to biological weapons). The charges stemmed from him mailing threatening letters containing ricin to the President of the United States, a U.S. Senator and a Mississippi Judge. On May 2, 2013, the Court held a preliminary hearing. Magistrate Judge Alexander bound the case over to the grand jury. She also denied petitioner's bond and ordered his detention. On May 30th, the grand jury returned a five count indictment charging petitioner with violations of 18 U.S.C. §§ 175(a), 871, 876 and 1001, that is, mailing threatening communications to the above individuals and for attempting to frame another individual for the crimes. Petitioner waived his initial appearance and arraignment.

On June 13, 2013, the attorney for an inmate in the Lafayette County Detention Center informed the FBI that petitioner may be attempting to have ricin manufactured and mailed to the

same individuals and Assistant U. S. Attorney Chad Lamar, the lead prosecutor on this case. The inmate cooperated with the FBI. After interviewing the inmate, the FBI determined that AUSA Lamar was not a target, but the threat against the others required further investigation. On June 20, 2013, petitioner spoke surreptitiously to the inmate's girlfriend via telephone to recruit her to acquire the materials to make ricin and to mail threatening letters containing ricin to U.S. Senator. This call was recorded by the Lafayette County Detention Center. During the call, petitioner told the girlfriend that he would mail her two letters, one containing the recipe for ricin and the other containing the template for the letters. The letters were intercepted and FBI experts opined that the recipe was valid and would produce a substance containing ricin. Petitioner was temporarily placed in solitary confinement for violation of the detention center's policies.

Within a short time of his relocation into general population, petitioner was again recorded on the Lafayette County Detention Center system attempting to persuade his wife, Janet Cayson, and juvenile step-daughter to intimidate a juvenile, prosecution witness against him in a state criminal case where he had been indicted on multiple molestation charges.

On September 5, 2013, the government was advised by a cooperating inmate that petitioner was attempting to gain his assistance in a murder for hire scheme to kill Special Agent Stephen Thomason, FBI. Special Agent Thomason was one of the lead case agents on petitioner's case and he also testified extensively at his preliminary hearing. The cooperating inmate was a known Aryan Brotherhood member housed with petitioner in the Lafayette County Detention Center. Petitioner told him he would get a cell phone with internet service smuggled into the facility so that he could make secure calls and emails to raise money to carry out the plot. Letters sent by petitioner through this cooperating inmate were seized. The letters are consistent with the cooperating inmate's report.

2

Based upon the foregoing, it was determined that there was a substantial risk that petitioner's communications or contact with persons could result in death or serious bodily injury to persons, and, pursuant to 28 C.F.R. § 501.3, Special Administrative Measures (SAMs) were requested, authorized by the United States Attorney General and implemented on October 10, 2013, to restrict petitioner's access to the mail, the media, the telephone and visitors.

A superseding indictment was returned on November 20, 2013, which incorporated as an additional count the scheme to have the girlfriend of another inmate produce and mail ricin on petitioner's behalf. Petitioner entered a guilty plea to Counts 1, 2, 3, and 4 of the superseding indictment on January 17, 2014.

The plea agreement contained a waiver of appellate rights on page 2, which stated:

> 4.      WAIVER OF ALL APPEALS AND COLLATERAL ATTACKS: Defendant hereby expressly waives any and all rights to appeal the conviction and/or sentence imposed in this case, and the manner in which sentence was imposed, on any ground whatsoever, including but not limited to the grounds set forth in 18 U.S.C. § 3742. Defendant also hereby expressly waives all rights to contest or collaterally attack the conviction and/or sentence, and the manner in which sentence was imposed, in any post-conviction proceeding, including but not limited to a motion brought pursuant to 28 U.S.C. § 2255, excepting only any grounds or allegations of ineffective assistance of counsel. Defendant waives these rights in exchange for the concessions and recommendations made by the United States in this plea agreement.

The factual basis took note of the fact that there was evidence of ricin production at petitioner's former business, that petitioner's computer contained evidence of research on the production of ricin, and that the letters, and address labels on them, that were sent to the President, the Senator from Mississippi, and the local judge were printed on the printer that had come from petitioner's home and had been stored at another location.

During petitioner's initial, and ultimately aborted, sentencing hearing on May 13, 2014, the Court heard and ruled on all of petitioner's objections to the Pre-Sentence Report which are

relevant to issues he now raises in his motion to vacate. That sentencing hearing was continued in order to give the petitioner the opportunity to consider making a motion to withdraw his pleas of guilty.

Petitioner ultimately elected to go forward with sentencing, and received a sentence of 25 years to serve in federal custody on May 19, 2014, per the provisions of the plea agreement. At that hearing, he reiterated his guilty pleas and his understanding of them, and specifically reiterated his recognition that he was giving up his right to challenge the conviction and sentence.

Petitioner, while incarcerated in Kentucky, filed a habeus petition on January 26, 2015 complaining of the imposition of SAMs. By federal regulation, the Attorney General is authorized to direct the Bureau of Prisons (BOP) to impose SAMs when there has been a finding that the measures are "reasonably necessary to protect persons against the risk of death or serious bodily injury." *See* C.F.R. § 501.3(a). Dutschke's petition was denied on March 2, 2015, for want of jurisdiction in the Northern District of Mississippi on the merits.

SAMs are non-punitive measures that protect individuals and the security interests of the United States. The United States Attorney General authorized them because of the petitioner's continual abuses of his privileges while incarcerated and because of petitioner's attempt to have ricin sent to the U.S. Senator and his attempt to hire another to kill Special Agent Thomason.

Petitioner then filed a motion to vacate pursuant to 28 U.S.C. § 2255 and a memorandum in support thereof on April 27, 2015, making a number of claims regarding the impropriety of his convictions.

4

## II. <u>DISCUSSION</u>

Because the need for finality has "special force with respect to convictions based on guilty pleas," a guilty plea may be attacked on collateral review only to "strictly limited" circumstances. *Bousley v. United States*, 523 U.S. 614, 621 (1998). Such limited circumstances have not been met in this case, thus Mr. Dutschke should be barred from habeas review.

The writ of habeas corpus has historically been regarded as an extraordinary remedy, "a bulwark against convictions that violate 'fundamental fairness.' " *Brecht v. Abrahamson*, 507 U.S. 619, 634, 113 S. Ct. 1710, 1719(1993). "Those few who are ultimately successful [in obtaining habeas relief] are persons whom society has grievously wronged and for whom belated liberation is little enough compensation." *Abrahamson*, 507 U.S. at 634. There are four grounds upon which a federal prisoner may move to vacate, set aside, or correct his sentence: (1) the sentence was imposed in violation of the Constitution or laws of the United States; (2) the court was without jurisdiction to impose the sentence; (3) the sentence exceeds the statutory maximum sentence; or (4) the sentence is "otherwise subject to collateral attack." 28 U.S.C. § 2255; *see United States v. Cates*, 952 F.2d 149, 151 (5th Cir. 1992). The scope of relief under § 2255 is consistent with that of the writ of habeas corpus. *Cates*, 952 F.2d at 151. Relief under 28 U.S.C. § 2255 is not available to test the legality of matters that should have been raised on appeal. *United States v. Walling*, 982 F.2d 447, 448-449 (10th Cir. 1992). A petitioner is barred from raising constitutional claims for the first time on collateral review unless he demonstrates a cause for failing to raise the issue on direct appeal and actual prejudice resulting from error. *United States v. Pierce*, 959 F.2d 1297, 1301 (5th Cir. 1992), *cert. denied*, 506 U.S. 1007 (1992); *United States v. Shaid*, 937 F.2d 228, 232 (5th Cir. 1991). The burden of showing "cause," an "objective factor external to the defense," rests with the petitioner. *McCleskey v. Zant*, 111 S.Ct.

1454, 1470 (1991). No other types of errors may be raised on collateral review unless the petitioner demonstrates that the error could not have been raised on direct appeal, and if condoned, would result in a complete miscarriage of justice. *Pierce*, 959 F.2d at 1301; *Shaid*, 937 F.2d at 232. A motion brought under § 2255 cannot be used as a substitute for a direct appeal. *See United States v. Addonizio*, 442 U.S. 178 (1979). In general, relief under 28 U.S.C. § 2255 is reserved for transgressions of constitutional rights and for a narrow range of claims that could not have been raised on direct appeal. *See United States v. Segler*, 37 F.3d 1131, 1133 (5th Cir. 1994).

In the present case, the petitioner makes a variety of arguments, including that his Constitutional rights have been violated by an illegal conviction that the Court lacks jurisdiction over a certain count of the indictment, and that his counsel was ineffective. Most of the arguments made by petitioner pertain to issues that have either been addressed by the Court at sentencing or could have been addressed on appeal had the petitioner not waived that right. It is clear that petitioner is unhappy with the results of his plea and the conditions of his confinement and has couched his entire motion in terms of "Constitutional violation," "lack of jurisdiction," and "ineffective assistance" simply to keep the present motion from being dismissed summarily and as a substitute for a direct appeal. Even if the Court were to deem the petition proper despite his waiver, none of the grounds raised by Dutschke afford him any relief.

To obtain collateral relief under 28 U.S.C. § 2255, a defendant "must clear a significantly higher hurdle" than the standard that would exist on direct appeal. *United States v. Frady,* 456 U.S. 152, 166 (1982). "Following a conviction and exhaustion or waiver of the right to direct appeal, [courts] presume a defendant stands fairly and finally convicted." *United States v. Cervantes,* 132 F.3d 1106, 1109 (5th Cir. 1998). "As a result, review of convictions under [§]

2255 ordinarily is limited to questions of constitutional or jurisdictional magnitude, which may not be raised for the first time on collateral review without a showing of cause and prejudice." *Id.; see also Massaro v. United States,* 538 U.S. 500, 504 (2003); *Frady,* 456 U.S. at 166; *United States v. Lopez,* 248 F.3d 427, 433 (5th Cir. 2001); *United States v. Kallestad,* 236 F.3d 225, 227 (5th Cir. 2000).

*Pro se* pleadings are reviewed under a less stringent standard than those drafted by attorneys and are entitled to a liberal construction that includes all reasonable inferences which can be drawn from them. *See Erickson v. Pardus,* 551 U.S. 89, 94 (2007); *Haines v. Kerner,* 404 U.S. 519 (1972). At the same time, however, *pro se* litigants are still required to provide sufficient facts to support their claims. *United States v. Pineda,* 988 F.2d 22, 23 (5th Cir. 1993). Even under the rule of liberal construction, "mere conclusory allegations on a critical issue are insufficient to raise a constitutional issue." *Id.* (citing *United States v. Woods,* 870 F.2d 285, 288 n. 3 (5th Cir. 1989)); *see also Ross v. Estelle,* 694 F.2d 1008, 1011 (5th Cir. 1983) ("Absent evidence in the record, a court cannot consider a habeas petitioner's bald assertions on a critical issue in his *pro se* petition ... to be of probative evidentiary value.").

A motion brought under 28 U.S.C. § 2255 may be denied without a hearing if the motion, files, and records of the case conclusively show that the defendant is not entitled to relief. *See United States v. Bartholomew,* 974 F.2d 39, 41 (5th Cir. 1992) (*per curiam* ) (citing *United States v. Auten,* 632 F.2d 478 (5th Cir. 1980)). In this instance, the record demonstrates that the petitioner is not entitled to relief, because he is raising issues that he effectively waived by entering pleas of guilty, by making unsupported assertions, by raising issues that the Court has actually disposed of in rulings, and by making false assertions of ineffective assistance of counsel.

### III.  PROCEDURAL BAR

### Waiver of Collateral Review

This motion should be dismissed because the defendant waived post-conviction attacks upon his conviction or sentence in his plea agreement and has not asserted a valid claim that the waiver was involuntary or uninformed.

As previously noted, in his written plea agreement with the United States, the defendant specifically waived his right to collaterally attack his conviction and sentence.

The transcript of the hearing clearly shows that defense counsel was asked whether he had reviewed the plea agreement with the defendant.  After receiving an affirmative response from defense counsel, the Court then ascertained whether the petitioner understood as well.  In fact, when asked by the Court whether he understood the waiver provision, petitioner replied "Unfortunately, I do ma'am" indicating his understanding of the rights he was giving up.  (Plea Transcript, p. 16.)  While under oath, Dutschke did not raise any issue with his understanding of the plea agreement.  Moreover, when the Court asked "I want to make sure that you are voluntarily entering a plea of guilty on your own free will, that you understand the charges that you're pleading to; and that this -- this description of your conduct is true and accurate." Dutschke replied "I'm voluntarily entering this plea and I understand fully that in doing so I am accepting responsibility for -- for everything that he mentioned."  The Court further asked, "Including the conduct that would be laid out in each of these four counts?"  Dutschke replied "Everything that he mentioned, ma'am."  (Plea Transcript, pp. 34 – 35)

The most basic rights of criminal defendants are subject to waiver.  *Peretz v. United States*, 501 U.S. 923, 936, 111 S. Ct. 2661, 115 L. Ed. 2d 808 (1991).  The Supreme Court has repeatedly recognized that a defendant may waive constitutional rights as part of a plea

agreement. *United States v. Melancon*, 972 F.2d 566, 567 (5th Cir. 1992) (citing *Town of Newton v. Rumery*, 480 U.S. 386, 393, 107 S. Ct. 1187, 1192, 94 L. Ed. 2d 405 (1987). The right to appeal is a statutory right, not a constitutional right. *Melancon*, 972 F.2d at 567 (citing *Abney v. United States*, 431 U.S. 651, 656, 97 S. Ct. 2034, 2038, 52 L. Ed. 2d 651 (1977)). A defendant may waive his statutory right to appeal as part of a plea agreement. *United States v. Henderson*, 72 F.3d 463, 465 (5th Cir. 1995). A waiver of post-conviction relief is valid if the waiver is informed and voluntary. *United States v. Wilkes*, 20 F.3d 651, 653 (5th Cir. 1994).

For a waiver to be knowing and voluntary, the defendant must know that he had "a right to appeal his sentence and that he was giving up that right." *United States v. Portillo*, 18 F.3d 290, 292 (5th Cir. 1994). For example, in *United States v. McKinney*, the Fifth Circuit found that "[b]ecause [defendant] indicated that he had read and understood the plea agreement, which includes an explicit, unambiguous waiver of appeal, the waiver was both knowing and voluntary." 406 F.3d 744, 746 (5th Cir. 2005). It is the responsibility of the district court to "insure that the defendant fully understands his right to appeal and the consequences of waiving this right." *United States v. Gonzales*, 259 F.3d 355, 357 (5th Cir. 2001) (citations omitted). Waivers of appeal are enforceable where the waiver language in the plea agreement is clear and unambiguous, and the defendant knowingly and voluntarily waived his rights. *United States v. White*, 307 F.3d 336, 339 (5th Cir. 2002).

In this Circuit, generally, "an informed and voluntary waiver of post-conviction relief is effective to bar such relief." *Wilkes*, 20 F.3d at 653. Only one exception exists to the waiver: an ineffective-assistance claim survives a "2255 waiver, but only when the claimed [ineffective] assistance directly affected the validity of that waiver or the plea itself." *United States v. Hollins*, 97 F. App'x 477, 479, 2004 WL 963250, *3 (5th Cir. May 4, 2004); *see also White*, 307

9

F. 3d at 339 (An ineffective assistance claim survives a waiver "only when the claimed assistance directly affected the validity of that waiver or the plea itself.").

Should any claims survive the waiver, the § 2255 petitioner bears the burden of establishing his claims of error by a preponderance of the evidence.[2] *Wright v. United States*, 624 F.2d 557, 558 (5th Cir. 1980). Where a defendant's unsupported assertions fail to establish sufficient grounds for relief under 28 U.S.C. § 2255, such a motion should be denied. *United States v. Smith*, No. 90-292, 1993 WL 17683 (E.D. La., January 14, 1993) (unpublished); *see Ross v. Estelle*, 694 F.2d 1008, 1012 (5th Cir. 1983) (establishing a court cannot consider bald assertions, unsupported by anything in the record, to be of probative evidentiary value); *see also United States v. Stracener*, 959 F.2d 31, 33 (5th Cir. 1992) (applying *Ross* analysis to determination of a 28 U.S.C. § 2255 motion).

An evidentiary hearing on a § 2255 petition is unnecessary when "the motion and the files and records of the case conclusively show that the prisoner is entitled to no relief...." 28 U.S.C. § 2255. Likewise, "[b]are, conclusory allegations unsupported by other indicia of reliability in the record, do not compel a federal District Court to hold an evidentiary hearing." *Ross*, 694 F.2d at 1012 n. 2; *accord United States v. Auten*, 632 F.2d 478, 480 (5th Cir. 1980) (noting that mere conclusory allegations are not sufficient to support a request for an evidentiary hearing).

Here, the record establishes that both Dutschke's plea and waiver of his appeal rights were knowing and voluntary. Dutschke's signed plea agreement contained an express waiver of his rights to appeal and collaterally challenge his conviction and sentence. By signing the plea agreement, Dutschke represented that he knew and agreed with the terms contained within the

---

[2] Where the judge considering the § 2255 motion also presided over the criminal case, said judge may rely on his or her recollection of the prior case. *Blackledge v. Allison*, 431 U.S. 63, 74, n. 4, 97 S. Ct. 1621 (1977).

agreement.  Having confirmed that he understood his limited appeal rights, Dutschke may not now contend that he did not understand his waiver.  Thus, as in *McKinney*, Dutschke indicated he understood his waiver of appeal, and therefore the waiver was made knowing and voluntarily. 406 F.3d at 746.  His claim counsel was ineffective is without merit.  Accordingly, for the reasons stated, the Court should deny Dutschke's motion for habeas relief pursuant to 28 U.S.C. § 2255.

This motion should be dismissed.  If it is not dismissed, the government would move forward to address petitioner's claims on their merits.

## IV.  ARGUMENT

The petitioner's initial group of claims focuses on whether ricin toxin should be considered a chemical weapon rather than a biological weapon; whether 18 U.S.C. §§ 175 or 18 U.S.C. § 228 would be the correct statute for such an offense; that the government admitted this was not weaponized ricin toxin, but confirmed by forensic analysis to be innocuous castor fertilizer; and whether a recent Supreme Court case precludes a prosecution such as his.

Ricin is a highly lethal biological toxin.  It is made from plant material.  According to the United States Centers for Disease Control and Prevention (CDC), "Ricin is a poison found naturally in castor beans.  If castor beans are chewed and swallowed, the released ricin can cause injury.  Ricin can be made from the waste material left over from processing castor beans." http://emergency.cdc.gov/agent/ricin/facts.asp  Based on this statement from the CDC, ricin naturally exists in the castor beans making it a "product of plants."  The CDC also states that "[i]t would take a deliberate act to make ricin and use it to poison people.  Unintentional exposure to ricin is highly unlikely, except through the ingestion of castor beans."  This statement supports the argument that the ricin poison is naturally found in the castor beans, and

11

is therefore a "product of plants." Case law makes it clear that this is the accepted view of the courts as well. For instance, in *United States v. Baker*, 98 F.3d 330 (8th Cir. 1996) evidence sustained a conviction for knowing possession of ricin, a toxin, for use as weapon, notwithstanding defendant's statements that he intended to use ricin to kill garden pests and that he did not know who had given it to him; ricin was shown to be extremely toxic, deadly in extremely small quantities, and very difficult to detect, with no known antidote, and to have been popularized as method of killing people, handwritten note addressed to defendant and found inside coffee can with ricin contained information about dangerousness of contents and precautions to be used in handling it, and defendant admitted to Federal Bureau of Investigation (FBI) that he knew that ricin was dangerous and had to be handled with extreme care. *United States v. Baker*, 98 F.3d 330 (8th Cir. 1996). The case was brought under 18 U.S.C.A. § 175. Also, *United States v. Olsen*, 120 F. App'x 18 (9th Cir. 2004), made it clear that where the evidence established that defendant made ricin for use as a weapon the proper statute was 18 U.S.C.A. § 175(a). *United States v. Olsen*, 120 F. App'x 18 (9th Cir. 2004). Likewise, in *United States v. Hughes*, 273 F. App'x 587 (9th Cir. 2007), evidence was sufficient to support conviction under 18 U.S.C. § 175 for attempted production of a biological toxin; evidence showed that defendant possessed instructions for the manufacture of ricin and all of the necessary equipment and materials to follow those instructions, and that defendant's food dehydrator tested positive for castor bean DNA. *United States v. Hughes*, 273 F. App'x 587 (9th Cir. 2007). The toxicity issue was addressed by this Court at sentencing in this case and is settled.

As to petitioner's claim that the government admitted that this is not weaponized ricin toxin, but was instead confirmed by forensic analysis to be a simple innocuous castor fertilizer,

the most succinct response, when this issue was heard at his plea (and ultimately decided in favor of the government at sentencing) was this from the government:

> Mr. Sigler: "…the defendant could not have known the strength of the ricin he had created, the active ricin that he created without performing tests that would involve the death of animals, who are directly exposed to it, or very sophisticated assays that are done at the most sophisticated scientific laboratories in the United States. It was active ricin. He couldn't know how strong it was when he put it in the mail to the president, to the senator, to the judge. And also to the extent that the airborne quality is discussed in the sentencing memorandum, we're prepared to address that because of the hydrophilic nature of ricin. It draws in water, and so when it's examined weeks or days after the fact, it's not in the same physical state that it was when it was put in the envelope."

(From the First Sentencing Hearing, May 13, 2014, p. 18, lines 14-25, and p. 19, lines 1-3). This issue was previously raised and rejected by the Court, and should be precluded from consideration.

Dutschke has also offered no proof that the substance was intended for use as a fertilizer, he simply makes an unsupported claim that it is a harmless fertilizer. That lack of intent to use it as a fertilizer is also shown through mailing the substance to government officials with a threatening letter. Petitioner fails to address the issue that his home printer printed the letters sent to the President, the Senator, and the Judge, as well as the address labels, and the letters distinctly failed to mention the potential use of the granular substance therein as a fertilizer. This issue is without merit.

Section 175(a) of Title 18 criminalizes 'knowingly develop[ing], produc[ing], stockpile[ing], transfer[ing], acquir[ing], retain[ing], or possess[ing] any biological agent, toxin, or delivery system for use as a weapon. It also criminalizes attempts, threats, and conspiracies.

The statute defines the term "for use as a weapon" to "include the development, production, transfer, acquisition, retention, or possession of any biological agent, toxin, or

13

delivery system for other than prophylactic, protective, bona fide research, or other peaceful purposes. *See United States v. Baker*, 98 F.3d 330, 338 (8th Cir. 1996); *United States v. Hughes*, 273 Fed. App'x 587, 590-91 (9th Cir. 2007); cf. *United States v. Panzero*, 225 F.3d 660, 2000 WL 977357, at *4 (6th Cir. 2000) (unpublished table opinion). The statute reaches subjects of palpable federal importance by defining "toxin" as "the toxic material or product of plants, animals, microorganisms (including, but not limited to, bacteria, viruses, fungi, rickettsiae or protozoa), or infectious substances, or a recombinant or synthesized molecule, whatever their origin and method of production," including "any poisonous substance or biological products that may be engineered as a result of biotechnology product that may be engineered as a result of biotechnology produced by a living organism" or "any poisonous isomer or biological product, homolog, or derivative of such a substance" a definition found at 18 U.S.C. § 178(2). In *Gonzales v. Raich*, 545 U.S. 1 (2005), the Supreme Court cited § 175 as an exemplar for the proposition that the federal government, under the powers enumerated in Article I, § 8, of the U.S. Constitution, may rationally "[p]rohibit[ ] the intrastate possession or manufacture of an article of commerce." *Id*. at 26 & n.36.

Dutschke, stated that a recent United States Supreme Court case in which Justices unanimously concurred that a broad and vague interpretation of the similar chemical weapons statute 18 U.S.C. § 229 was found to be absurd and should not apply to anything other than the true chemical warfare intended by the Chemical Weapons Convention international treaty. (*Bond v. United States*, 134 S. Ct. 2077, 189 L. Ed. 2d 1, 2014 U.S. LEXIS 3988, 82 U.S.L.W. 4417, 24 Fla. L. Weekly Fed. S 803, 2014 WL 2440534 (U.S. 2014).) (p. 7). Petitioner's reliance on *Bond* is misplaced. *Bond* was a case in which a woman attempted to use chemicals to injure a romantic rival who resided in the same community, and the chemical weapons statute

14

was employed. The defendant in that case did not, however, mail items containing chemicals in interstate commerce to the President and a United States Senator. Also, in *Bond*, the Court interpreted a different statute from that used in the instant case, 18 U.S.C. § 229, which forbids knowingly "possess[ing] or us[ing]…any chemical weapon," 18 U.S.C. § 229(a)(1), and which Congress enacted to implement the international Convention on Chemical Weapons." *See* Convention on the Prohibition of the Development, Production, Stockpiling and Use of Chemical Weapons and on Their Destruction, S. Treaty Doc. No. 103-21, 1974 U.N.T.S. 317. *Bond* does not have the sweeping ramifications for prosecutions under § 175 that petitioner suggests. To the contrary, in interpreting § 229, the *Bond* Court observed that "[t]his case is unusual, and our analysis is appropriately limited." 134 S. Ct. at 2093. *Bond* does not remotely suggest that Congress intended to exempt the possession of ricin when it banned the possession of biological toxins in § 175. The statute at stake in *Bond* defines a 'chemical weapon' as '[a] toxic chemical and its precursors, except where intended for a purpose not prohibited under this chapter,' 18 U.S.C. § 229F(1)(A), and further defines 'toxic chemical' as 'any chemical which through its chemical action on life processes can cause death, temporary incapacitation or permanent harm to humans or animals.'" *Id.* § 229F(8)(A).

First, as used in section 175(a), the terms "toxin" and "biological agent" (*see* 18 U.S.C. § 178(2)) are more targeted than section 229's definition of "toxic chemicals," which (absent a limiting construction) could be read to include household chemicals used on a daily basis. Section 175(a), moreover, limits prosecution to those instances in which a defendant possesses the toxin or agent "for use as a weapon." And in general, there is no longstanding tradition of States prosecuting crimes involving biological weapons, which require specialized handling by first responders and investigators to ensure that such toxins are not harmfully transmitted.

15

Second, Dutschke's production and possession of ricin falls squarely within the heart of section 175, because ricin is an "extremely dangerous substance with the potential to cause severe harm to many people." The Secretary of Health and Human Services has determined that ricin "pose[s] a severe threat to public health and safety" and has placed ricin on the list of select agents and toxins. 42 C.F.R. § 73.3. "Ricin is about 1,000 times more toxic than potassium cyanide," *see Handbook of Toxicology of Chemical Warfare Agents* (Ramesh C. Gupta, ed., 2009) (ch. 19, "Cyanide Toxicity and its Treatment"; ch. 25, "Ricin and Abrin"). In the wake of *Bond*, other courts of appeals have likewise affirmed convictions under section 229 or comparable statutory authorities in a variety of fact patterns. For instance, in *United States v. Hale*, 762 F.3d 1214, 1224-26 (10th Cir. 2014), the court upheld a conviction under the hoax statute, 18 U.S.C. § 1038(a), of defendant who sent a package to a bankruptcy trustee purporting to contain hantavirus, even though the hantavirus was in reality relatively innocuous mouse droppings. Likewise, Dutschke knowingly and voluntarily pled guilty to a violation of 18 U.S.C. § 175, having argued against the applicability of the statute to his case, and has thus waived this ground.

Petitioner's next arguments are basically a continuation of his objection that was overruled by the Court relating to the toxicity of the ricin. On this point, it is helpful to look back at the Court's ruling regarding this issue.

> The Court: "I think the government is correct in their argument here...I think it is very clear under the guidelines that the toxicity of ricin is of no consequence in making that determination, as this enhancement also applies to defendants who simply threaten to use one of the listed toxic chemicals. And ricin is one of those toxic chemicals that's listed in the annex that would be applicable. The level of toxicity, the purity is immaterial in making a determination with respect to whether or not the two-level enhancement applies. The Court finds that it does

16

apply.  The objection is overruled."  (May 13, 2015 Sentencing Transcript, pp. 20-21)

Petitioner also argues for use of the "Round to Zero Rule" found in 15 C.F.R. § 712(1), which does not apply in this case.  Under the plain meaning rule the title of the statute can be used to clarify a section.  The title "Round to zero rule that applies to activities involving Schedule 1 chemicals" plainly refers to Schedule 1 chemicals which are used in conjunction with § 229, the Chemical Weapon Convention statute.  Under the § 229 list, Ricin is a Schedule 1 chemical, but in the "Select Agent and Toxins list" applicable to § 175 "[t]he select agents and toxins marked with an asterisk (*) are designated as Tier 1 select agents and toxins…"  Under 42 C.F.R. § 73(3)(b), Ricin is not marked with an asterisk.  This is because Ricin is a Tier 2 Toxin, and because Ricin is not a Tier 1 toxin which could be considered parallel to the classification of Schedule 1 chemicals § 229 then the "round to zero" arguably considered a "trace exception" does not apply to Ricin.  As the *Bond* Court put it, the federal Government "undoubtedly has a substantial interest in enforcing criminal laws against assassination, terrorism, and acts with the potential to cause mass suffering,' which 'have not traditionally been left predominately to the States."  134 S. Ct. at 2092.

Dutschke also argues that "the very public threat of life imprisonment" (for a non-toxic fertilizer) would not have existed and the outcome would have been markedly different had an appropriate charge been alleged instead of 18 U.S.C. § 175.  In doing so, he claimed a "forced coerced plea" on page 9 of his submission.  Again, it is helpful to look to the transcript.  At the dialogue from Change of Plea Hearing on January 17, 2014, the elements of Title 18, United States Code, Section 175(a), were read to the petitioner.  That was followed by this exchange:

The Court:  Mr. Dutschke, do you understand the elements to Count 1?  (p. 10, line 8-9)
Dutschke:  I do.  (p. 10, line 10)

17

The Court then affirmed the petitioner's understanding of the proceeding:

The Court: Did you discuss the facts of the case, as well as any discovery, which I know has been very voluminous? (p. 18, lines 10-11)

Mr. Coghlan: Yes, Your Honor. (p. 18, line 12)

The Court: And do you believe that your client understands the charges, and that he understands the consequences of entering this plea? (p. 18, lines 13-15)

Mr. Coghlan: Yes, Your Honor. (p. 18, line 16)

The Court: And do you believe he has entered the plea freely, knowingly, and voluntarily? (p. 18, lines 17-18)

Mr. Coghlan: Yes, Your Honor. (p. 18, line 19)

And then there is the following exchange in relation to Dutschke's past and current arguments:

Mr. Coghlan: Your Honor, before you accept his plea, may I make a brief record about some additional facts that Mr. Dutschke's aware of; so that the record will be clear in the event there's some postconviction proceeding where it may be unclear about what he did? (p. 36, lines 5-9)

The Court: Okay. But there won't be -- if the Court accepts the plea -- (p. 36, lines 10-11)

Mr. Coghlan: There has been one claim that has been reserved that he has not waived. (p. 36, lines 12-13)

The Court: Thank you. You may proceed. (p. 36, line 14)

Mr. Coghlan: Your Honor, the base offense level, before enhancements, under the guidelines in this case, range from a level 42 down to a level 20. That's before enhancements. The guidelines provide that if a defendant threatened to spread the -- the commentary talks about anthrax. But if a defendant threatens to spread a poison and, in fact, spreads a powdery substance but the powdery substance is harmless, it's a much reduced guideline level than a level 42. (p. 36, lines 15-22.) The defendant has been made aware that defense experts have reviewed the Government's discovery; and using the Government's results and the Government's testing at face value, that in one sample the amount of ricin was 75 micrograms, which is 75 one-millionths of one gram of ricin, which would not be visible to the naked eye. (p. 36, lines 23-25 – p. 37, lines 1-3.) The second substance tested, using the Government's own numbers, contained 91 micrograms of ricin or 91 one-millionths of one gram of ricin. So I want the record to be clear that the defendant knows that; that he knows that experts, defense experts, have look at it; that defense experts very well may have been prepared to testify that the substance was harmless. (p. 37, lines 4-9.) But if the proof that the Government lays out contradicted the defense proof, he could be looking at life in prison; or he could be looking at something much less than 25 years if the defense proof bore out to be the facts. (p. 37, lines 10-13.) He is accepting this plea realizing that there are consequences either way, and he is satisfied that this is a

18

compromise that he is willing to enter into and is entering into voluntarily. And he knows all these facts now, so that there's no question later on that he did not know those facts when he entered this plea. (p. 37, lines 14-19)

The Court:    Did you understand everything Mr. Coughlan just stated? (p. 37, lines 20-21)

Dutschke:    Yes, ma'am. (p. 37, line 22)

This was followed by this dialogue from First Sentencing Hearing May 13, 2014:

Mr. Coghlan:    Your Honor, on the first question of whether the substance was capable of producing any injury, death, or serious bodily injury, two points. One is, in this particular case, part of the government's proof was that the defendant allegedly sent his recipe for making ricin to another individual, which the government intercepted and was able to analyze. (p. 14, lines 7-13.) The government agents in this case looked at the -- I'm going to call it the recipe, and attached to my objections, the conclusion by the government scientist was -- it says "Additionally, if the recipe were followed as described, the final solid product would likely contain detectable levels of ricin, but be impure and of questionable toxicity." (p. 14, lines 14-19.) Second, Your Honor, the two samples that the government obtained from the senator's office and, I believe, the judge's office, one contained .6987 grams of a granular substance which the government maintains had a ricin purity level of .013 percent, which would be .00013, I guess, but in any event, that's 91 on millionths of 1 gram. The second sample contained .015 grams of a granular substance with a ricin purity level of .05 percent, which would be 75 one millionths of 1 gram of ricin. The first sample would be 91 one millionths of 1 gram of ricin. (p. 14, lines 20-25 – p. 15, lines 1-4.) You combine the microscopic levels of ricin with the impurity that the government report noted, I think the defendant has demonstrated that the substance was either harmless or not -- that there's not enough proof that it was harmful. But as Your Honor accurately pointed out, if the defendant thought that the substance was harmful, he does not get the benefit of a level 20. (p. 15, lines 5-11.) The probation service noted in their -- in the response to my objections that there was a seizure of a mask and maybe some gloves, which probation service felt showed at least circumstantial evidence that the defendant must have thought that the substance could be harmful. Otherwise, why would he use a mask and gloves? (p. 15, lines 12-17.) Your Honor, I don't -- that's certainly good argument, but people use masks and gloves for a lot of things, not necessarily because they think it would be capable of death. So, Your Honor, for those reasons, we feel like that a base offense level of 20 would be appropriate. (p. 15, lines 18-22)

…

The Court:    Thank you. Counselors, this is one that I think, frankly, the defendant's argument totally misses the mark. I think it's very clear under the guidelines that the toxicity of ricin is of no consequence in making that determination, as this enhancement also applies to defendants who simply threaten to use one of the listed toxic chemicals. And ricin is one of those toxic chemicals that's listed in the annex that would be applicable. (p. 20, lines 13-25, containing a break.) The

level of toxicity, the purity is immaterial in making a determination with respect to whether or not the two-level enhancement applies. The Court finds that it does apply. The objection is overruled. (p. 21, lines 1-4)

Later in that hearing, an exchange took place between the Court and petitioner in which he made a lengthy argument, ultimately rejected by the Court, as to ricin classification and toxicity, found at pp. 38-40 of the transcript of that hearing.

| | |
|---|---|
| Dutschke: | I think I am, but there's -- it's really essential that everybody understand that there's a huge difference between ricin toxin and ricin proteins. There were no -- there was no ricin toxin anywhere in my castor fertilizer. (p. 38, lines 3-7) |
| The Court: | Uh-huh. (p. 38, line 8) |
| Dutschke: | The way to make castor fertilizer -- and anybody in here can easily look this up -- is to simply do exactly what I did. The precautions were taken to make sure that something that could have once been toxic was not toxic, was made un-toxic. (p. 38, lines 9-13.) It's called denaturing proteins, and you do it every day when you boil or cook an egg. You denature proteins. When that is done with castor products, there is no ricin toxin. It's simply scientifically impossible. And he's counting on people not knowing the difference, Your Honor. (p. 38, lines 14-18) From now on, anytime anybody says the word *ricin*, I would hope that they are immediately demanded for clarification. Do you mean ricin toxin or ricin proteins? If they say ricin toxin based on these tests, they're lying to you, because it's not possible. (p. 38, lines 19-23) |
| The Court: | Well, let's address that objection and your concerns. (p. 38, lines 24-25) |
| Dutschke: | Please, because -- (p. 39, line 1) |
| The Court: | And I do understand you -- (p. 39, line 2) |
| Dutschke: | -- because it's the biggest of the concerns. (p. 39, lines 3-4) |
| The Court: | I do understand your argument. (p. 39, line 5) |
| Dutschke: | Yes, ma'am. (p. 39, line 6.) |
| The Court: | Let me tell you again why it is that I believe it does not apply. Had we had a trial in this case, it would have been interesting. It would have been a long trial. A countless number of experts would have testified, and I don't doubt that experts for the government as well as for the defense would have explained over the course of weeks the very kinds of things that you are describing to me. (p. 39, lines 7-13.) In many of our pre-plea sessions, it was clear to the Court that this was complex, that I -- that -- it would have involved, a necessity, experts coming to testify to a jury about these very kinds of issues that you're bringing up. But there was a plea, and you pled to these four counts. (p. 39, lines 14-18.) Now, when I address these objections, I address them as they relate to the sentencing guidelines for sentencing purposes. For sentencing purposes, I am looking at whether or not offense level 20 applies or offense level 28 applies. And it's the Court's finding -- though you may disagree with it, it is the Court's finding that what makes the difference between level 20 and 28 is intent. (p. 39, lines 19-25) |
| Dutschke: | Okay. (p. 40, line 1) |

20

The Court:    You had the intent to develop this chemical weapon.  You did develop it.  It's undisputed that you developed a chemical that is and was ricin.  We can argue about whether it was granular or whether it could be inhaled, what purity it was.  We could argue those things, but they're immaterial for purposes of guideline sentencing, because it's your intent to manufacture, regardless of toxicity, and your intent to send those letters that drives that determination, and that's the Court's ruling.  (p. 40, line 2-10)

…

The Court:    Do you desire to go forward with the plea agreement today and be sentenced today, or do you desire to file a motion to withdraw?  (p. 74, lines 15-17)

Dutschke:     We're withdrawing, Your Honor.  (p. 74, line 18)

After Dutschke decided to go forward with his plea and sentencing at his final sentencing on May 19, 2014, the Court took great pains to insure that he reaffirmed the plea agreement, as well as his previous guilty pleas, and that he agreed to be bound by the terms therein.

Dutschke had ample discussion of his concerns, and time to consider his decision to move forward.  He affirmed to the Court that his plea was voluntary and he wished to go forward.  Petitioner, in his pleading, goes on to contend that his actual innocence is at issue.

In this case, the petitioner provides no proof of actual innocence, other than a rehash of arguments already made and already rejected.  The factual bases clearly established his guilt on the counts of conviction.  He manufactured ricin.  It was mailed to three individuals.  He pled guilty under oath, and has offered no proof to negate those facts.

The petitioner then contends in his pleading that the SAMs were ordered to silence him, and pressure him into a plea deal.  As previously discussed, the SAMs were ordered primarily because, as an inmate, petitioner clearly attempted to have ricin manufactured yet again while in custody with the assistance of the girlfriend (who was not incarcerated) of a fellow inmate.  This is proven by an audio recording as well as a handwritten recipe in the petitioner's own handwriting.  He made this attempt in order to frame someone else yet again, and intended that the substance produced be mailed yet again to one of his previous victims in Washington, D.C.

21

The SAMs were ordered because of this and other conduct. The cause of the issuance of the SAMs is the petitioner, and solely due to his actions and he could obviously still availed himself of a trial on his federal case or the state child molestation case if he chose to do so. He bargained for a plea instead.

Petitioner then claims that by the date of the final analysis, the prosecution also had additional evidence that the granular substance was specifically used and intended for use as the common castor fertilizer the maker intended but no proof is provided to support the assertion, and the government is aware of none.

He goes on to state that he is not the mailer, and that he believes that the intentions of the mailer and the maker should not be combined. Dutschke avers that focusing on the element of "develops" in § 175 is appropriate. Again, the transcripts are helpful.

In dialogue quoted from the Change of Plea Hearing from Jan. 17, 2014, the following was stated:

The Court:     And in Count 2, you are charged that you did knowingly and willfully deposit, and cause to be deposited for conveyance in the mail and for delivery from any post office and by any letter carrier, a letter, paper, writing, and document containing a threat to take the life of and to inflict bodily harm upon the President of the United States; and that letter contained ricin. Do you understand Count 2? (p. 8, lines 17-23)

Dutschke:     Yes, Your Honor, I understand Count 2. (p. 8, lines 24-25).

The Court:     Counts 3 and 4 of the superseding indictment are the same, knowingly deposit in any post office, or authorized depository, for mail matter to be sent or delivered by the postal service and knowingly cause to be delivered by the postal service, according to the directions thereon a communication addressed to another person and containing a threat to injure the person and contained ricin. You understand Counts 3 and 4 of the superseding indictment? (p. 9, lines 1-9)

Dutschke:     Yes, ma'am. (p. 9, line 10)

...

22

| The Court: | So, Mr. Dutschke, with respect to your case, you're Cause No. 1:13CR81, do you plead guilty or not guilty to Count 1 of the superseding indictments?  (p. 38, lines 19-21) |
|---|---|
| Dutschke: | Yes, Your Honor.  (p. 38, line 22) |
| The Court: | Guilty or not guilty?  (p. 38, line 23) |
| Dutschke: | Oh, I'm sorry.  Guilty, Your Honor.  (p. 38, line 24) |
| The Court: | And on Count 2 of the superseding indictment, do you plead guilty or not guilty?  (p. 38, line 25 – p. 39, line 1) |
| Dutschke: | Guilty, Your Honor.  (p. 39, line 2) |
| The Court | On Count 3 of the superseding indictment, do you plead guilty or not guilty?  (p. 39, lines 3-4) |
| Dutschke: | I plead guilty, Your Honor.  (p. 39, line 5) |
| The Court: | And on Count 4 of the superseding indictment, do you plead guilty or not guilty?  (p. 39, lines 6-7) |
| Dutschke: | I'm pleading guilty, Your Honor.  (p. 39, line 8) |

The petitioner then goes on to argue that there is no evidence to support that the petitioner "stock piled…acquired, retained or possessed" any kind of biological weapon or Ricin Toxin, and that the indictment was unconstitutional because it merely lists all of the elements without defining the specific conduct that applies to each element.  This is fallacious, and the indictment tracked the statute.  The proof as described in the government's Factual Basis makes his guilt in manufacturing and possessing ricin obvious and his plea effectively waives this argument.

Petitioner goes on to make the bald assertion that the government sought to "double down" on him after their failure to convict the original arrested suspect of mailing the 2013 KC Letters.  He claims that the government believed he was the maker of the Ricin and sought to expand the bounds of § 175 from dealing with actual weapons of biological warfare to include the simplest of harmless chemicals like this common castor fertilizer and chemicals that are legally exempted while claiming prosecutors knew it was never anything poisonous.  In fact, the government prosecuted the petitioner because he was guilty of producing, possessing and mailing ricin, and the government's "failure" to convict the original suspect was due to the

government dismissing the charges when it became apparent that he had been framed by petitioner. The government has already addressed its position on the toxicity/danger arguments. Further, this argument was known to him when he reaffirmed his guilty plea and was sentenced and is therefore waived.

The petitioner then turns his focus to what he views as the insurmountable obstacles preventing the government's attempt to use the "Hoax Clause" using 2M6(1) of the Sentencing Guidelines. First, he claims that this clause is specific to threats, and that the actual text of the 2013 KC Letters do not threaten the use of Ricin Toxin, and that the first use of the term was by the Government (6 months before uncovering that there was no toxin). The preliminary tests on the substance, as pointed out in the Factual Basis, were positive for ricin. The letters contained a reference to "even if someone has to die" along with a substance that tested positive for ricin.

"Whether a particular statement may properly be considered to be a threat is governed by an objective standard—whether a reasonable person would foresee that the statement would be interpreted by those to whom the maker communicates the statement as a serious expression of intent to harm or assault." *United States v. Orozco-Santillan,* 903 F.2d 1262, 1265 (9th Cir. 1990), *overruled in part on other grounds by Planned Parenthood of the Columbia/Willamette, Inc. v. American Coalition of Life Activists,* 290 F.3d 1058, 1066-70 (9th Cir. 2002) (*en banc*). In order to be subject to criminal liability for a threat, the speaker must subjectively intend to threaten. *See United States v. Bagdasarian,* 652 F.3d 1113, 1117-18 (9th Cir. 2011). It is not necessary that the speaker intend to follow through on the threat, commit an assault, or inflict actual physical harm, however. *See Planned Parenthood,* 290 F.3d at 1075. The petitioner mailed or caused to be mailed ricin to the President and the Senate mail facility, as well as locally. The obvious response from Washington, D.C. in this case, as well as the ongoing

national threat of terrorism, render this argument untenable. He pled guilty to this conduct and has waived his ability to challenge on this point.

Petitioner then points out that the "Hoax Clause" requires intent. He notes AUSA Lamar's argument that suggested that Dutschke intended for the substance to be toxic, but Dutschke argues that the actual evidence proves otherwise. Dutschke believes the government is in possession of "overwhelming evidence" that the petitioner was certain, maintained, and intended for it to be "harmless castor fertilizer." This is the same toxicity argument that has been addressed, but the government would point out that "[i]ntent may, and generally must, be proven circumstantially. Generally, the natural probable consequences of an act may satisfactorily evidence the state of mind accompanying the act, even when a particular mental attitude is a crucial element of the offense." *United States v. Maggitt,* 784 F.2d 590, 593 (5th Cir. 1986). (quoted by *United States v. Stoker*, 706 F.3d 643, 646 (5th Cir. 2013))

Also in this line of argument, Petitioner claims that use of the Threat Case "Hoax Clause" to assume intent requires actual possession of an actual biological weapon and a threat to use. He claims the Court erred by accepting the prosecutors' "intent" argument, because "he was not in possession of any biological weapons or toxic substance, there was never any threat or mention of a biological weapon, and there was absolutely no evidence of possession, therefore, 'intent' requirements were not met and not established" since both elements were absent. As previously noted, this Court has heard the issue of the nature of the substance and Dutschke's intent. As to petitioner's possession of it, the evidence demonstrates that it was produced by him at his former business and that it was mailed on letters printed on the petitioner's own printer, and was addressed with labels printed from that same printer.

Finally, Dutschke argues that the Threat Case "Hoax Clause" does not exist anywhere other than the Sentencing Guidelines, and is not found in any statute, so he asserts "one simply cannot be convicted of violating a law that does not exist." The Sentencing Guidelines Authority is set out in § 1A3.1, stating "[t]he guidelines, policy statements, and commentary set forth in this Guidelines Manual, including amendments thereto, are promulgated by the United States Sentencing Commission pursuant to: (1) section 994(a) of title 28, United States Code; and (2) with respect to guidelines, policy statements, and commentary promulgated or amended pursuant to specific congressional directive, pursuant to the authority contained in that directive in addition to the authority under section 994(a) of title 28, United States Code." (FCJ Federal Sentencing Guidelines Manual § 1A3.1 (11/1/14)). The Sentencing Guidelines apply to federal criminal cases, and as such they apply to this case. This assignment of error is specious.

## Ineffective Assistance of Counsel

The standard for judging the performance of counsel set out in *Strickland v. Washington,* 466 U.S. 668 (1984), requires the petitioner to prove (1) deficient performance and (2) resulting prejudice. *Strickland,* 466 U.S. at 697. Deficient performance is established by "show[ing] that counsel's representation fell below an objective standard of reasonableness." *Id.* at 688. To prove prejudice, "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694; *see also United States v. Kimler,* 167 F.3d 889, 893 (5th Cir. 1999). "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland,* 466 U.S. at 694. On federal habeas review, scrutiny of counsel's performance "must be highly deferential," and the Court will "indulge a strong presumption that strategic or tactical decisions made after an adequate investigation fall within the wide range of objectively reasonable

26

professional assistance." *Moore v. Johnson,* 194 F.3d 586, 591 (5th Cir. 1999) (citing *Strickland,* 466 U.S. at 689). In assessing counsel's performance, a federal habeas court must make every effort to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time of trial. *Strickland,* 466 U.S. at 689; *Neal v. Puckett,* 286 F.3d 230, 236-37 (5th Cir. 2002). "A court must indulge a 'strong presumption' that counsel's conduct falls within the wide range of reasonable professional assistance because it is all too easy to conclude that a particular act or omission of counsel was unreasonable in the harsh light of hindsight." *Bell v. Cone,* 535 U.S. 685, 701 (2002) (citing *Strickland,* 466 U.S. at 689). Federal habeas courts presume that trial strategy is objectively reasonable unless clearly proven otherwise. *Strickland,* 466 U.S. at 689.

The second prong of the *Strickland* test looks to the prejudice caused by counsel's deficient performance. This requires "a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt." *United States v. Mullins,* 315 F.3d 449, 456 (5th Cir. 2002) (quoting *Strickland,* 466 U.S. at 687). "[T]he defendant must show that counsel's errors were prejudicial and deprived defendant of a 'fair trial, a trial whose result is reliable.' " *United States v. Baptiste,* 2007 WL 925894, at *3 (E.D.La. Mar.26, 2007) (quoting *Strickland,* 466 U.S. at 687). "This burden generally is met by showing that the outcome of the proceeding would have been different but for counsel's errors." *Id.* A defendant must satisfy both prongs of the *Strickland* test in order to be successful on an ineffective assistance claim. *See Strickland,* 466 U.S. at 697. A court deciding an ineffective assistance of counsel claim is not required to address these prongs in any particular order. *Id.* If it is possible to dispose of an ineffective assistance of counsel claim without addressing both prongs, "that course should be followed." *Id.* In *Hill v. Lockhart,* the United States Supreme Court held that the two-part

27

*Strickland* standard was applicable to challenges to guilty pleas based on ineffective assistance of counsel. 474 U.S. 52, 58 (1985). With respect to the prejudice prong of *Strickland,* the defendant must show "that there is a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial." *United States v. Glinsey,* 209 F.3d 386, 392 (5th Cir. 2000) (quoting *Lockhart,* 474 U.S. at 59).

The following is quoted from the Change of Plea Hearing from Jan. 17, 2014:

The Court:    Now, Mr. Dutschke, do you understand that you have the right to continue to maintain your position of not guilty on each of these charges and to proceed to a jury trial?  (p. 4, lines 21-23)

Dutschke:    Yes, Your Honor.  (p. 4, line 24)

The Court:    And obviously, you have made a decision to enter this plea.  Have you discussed this and had an opportunity to fully discuss it with your attorney, Mr. Coghlan?  (p. 4, line 25 – p. 5, lines 1-3)

Dutschke:    Yes, ma'am.  (p. 5, line 4)

The Court:    Are you satisfied with the legal representation that Mr. Coghlan has given you in this case?  (p. 5, lines 5-6)

Dutschke:    Mr. Coghlan has given fine representation, ma'am.  (p. 5, lines 7-8)

The Court:    And do you believe that he has represented your best interests in this case?  (p. 5, lines 9-10)

Dutschke:    Yes, ma'am, I think so.  (p. 5, line 11)

The petitioner first claims Mr. Coghlan was misled by the prosecution's assertion that § 175 was appropriate.  Petitioner states that he informed Mr. Coghlan that Ricin Toxin cannot be biological and, is in fact chemical.  He believes there was no effort by counsel to investigate the application of § 175 and blindly accepted the prosecution's prejudicial error.  The government has already addressed the appropriateness of the statute employed in the indictment, and would point out every district in the country is apparently operating under the same misapprehension Dutschke attributes to his counsel.  Further, it is known to the government that Mr. Coghlan was in contact with leading experts in the field during the discovery process.

28

Petitioner then complains that Coghlan was aware of the non-toxicity and addressed that issue inadequately at the sentencing hearing on April 13, 2014. Dutschke believes he was correct in the realization that this was the key argument to the defense, but it would have been a better outcome if he had been aware of the trace impurities exemption for § 175 and § 229 that are written into the statutes and because he did not do the research he did not know. Counsel for the defense did recognize and address this issue by way of objection as previously noted in the transcript excerpts. Also, as noted previously, the Court rejected that argument. The trace exception argument was addressed previously in this response at page 17. The government would note that this issue has already been functionally raised at sentencing, and rejected by the Court. The petitioner has thus failed to satisfy either prong of *Strickland*, in that counsel raised the issue complained of, and the petitioner has suffered no prejudice.

Petitioner then asserted that Coghlan should have moved to sever the issues of the mailing of the letters from the making of the ricin, as the mailing is highly prejudicial to the question of "intent." The government agrees that the issue of mailing is very revelatory on the issue of intent in this case, because the two issues are in fact intertwined, resulting in the multi-count indictment. Evidence of petitioner's ricin production was found at the former martial arts studio that petitioner operated, and on items (such as a protective mask and a hammer) that came from that location. Also, as previously noted, the letters to the victims and the labels affixed to them were printed on petitioner's printer. His computer contained evidence of research into ricin production. His DNA was on the inside of a mask from the "dojo," as it came to be called, and ricin traces were found on the outside of that mask. Finally, Dutschke was audiotaped attempting to have additional ricin produced using his "recipe," and the instructions that were mailed out were unequivocally written by him. As further linkage in the proof between "making

and mailing," these instructions called for avoidance of leaving evidence in drain traps (as he had done at the "dojo") with instructions to mail the ricin to a previous target while including a letter designed to suggest another suspect. The multi-count indictment was entirely proper, and there was no legitimate reason to request a severance. The record reflects that counsel was not ineffective, as a motion to sever would have been frivolous.

Petitioner then argues that the conviction was obtained under a statute that is unconstitutional, essentially remaking the argument made earlier relating to the *Bond* case the chemical weapons statute. In *Bond*, the Supreme Court held that, in enacting the implementing statute for the Chemical Weapons Convention, 18 U.S.C. § 229, Congress did not unambiguously provide a clear indication to reach purely local crimes. At the same time, the Supreme Court made clear that its analysis was appropriately limited, and that section 229 would reach, among other things, the possession of extremely dangerous substances with the potential to cause severe harm to many people. *Bond* at 2092-93.

The petitioner then maintained that an international treaty cannot constitutionally be used to police and prosecute domestic behavior, and that such power is necessarily left to Congress and local lawmakers. Thus, he concluded that this is a jurisdictional overreach of the treaty, and a jurisdictional expansion by Congress by merely enacting a treaty. By way of response, and to again "paraphrase" from the government's reply brief in a similar case, Congress enacted section 175(a), which criminalizes the possession of biological toxins, to cover just this type of circumstance. This Court should reject petitioner's attempt to compare his case – which involves the extraction, possession and mailing of the biological toxin ricin – to the facts of *Bond*, which involved two chemicals with potentially peaceful uses, one of which was obtained over the internet.

30

In *United States v. Hale*, 762 F.3d 1214 (10th Cir. 2014) *cert. denied*, 135 S. Ct. 1464 (2015), Hale challenges his conviction for perpetrating a hoax involving biological weapons. Conceding that plain error review is appropriate, Hale argued that § 175, the predicate statute underlying his hoax conviction, is unconstitutional. Hale further conceded in his briefing that at the time of trial, the alleged error was not plain. He anticipated, however, that the Supreme Court's decision in *Bond v. United States,* 134 S.Ct. 2077, 189 L.Ed.2d 1 (2014), would render the error plain by holding unconstitutional an analogous statute, 18 U.S.C. § 229. The Supreme Court declined to reach the constitutional issue in *Bond. See* 134 S.Ct. at 2087. But Hale's concessions, coupled with the Court's decision to avoid the constitutional issue in *Bond,* doom his argument that Congress lacked authority to pass § 175. *United States v. Hale*, 762 F.3d 1214, 1224 (10th Cir. 2014) *cert. denied*, 135 S. Ct. 1464 (2015). Additionally, Hale attacked the sufficiency of the evidence for his hoax conviction, contending that the government failed to prove that his actions were not for "peaceful purposes" within the meaning of § 175(c). In *Bond,* the Supreme Court addressed the conviction of a woman for violating a section of the Chemical Weapons Convention Implementation Act of 1998, which makes it a crime knowingly to "possess or use ... any chemical weapon" and contains a similar "peaceful purpose" exception. 134 S.Ct. at 2085 (quoting 18 U.S.C. §§ 229(a)(1) & 229F(7)). The defendant in that case had applied "easy to see" chemicals to different objects belonging to a romantic rival in the hope that the rival would "develop an uncomfortable rash." *Id.* The Supreme Court reversed her convictions, reading the statute narrowly in an effort to avoid "dramatically intrud[ing] upon traditional state criminal jurisdiction." *Id.* at 2088. It considered the "ordinary meaning" of the defined term "chemical weapon," *id.* at 2091, explaining that "[t]he substances that Bond used bear little resemblance to the deadly toxins that are of particular danger to the objectives of the

Convention," *id.* at 2090 (quotation omitted). And the Court expressed concern that the government's broader interpretation "would transform the statute from one whose core concerns are acts of war, assassination, and terrorism into a massive federal anti-poisoning regime that reaches the simplest of assaults." *Id.* at 2091–92.

Hale, similar to Dutschke, argued that his conviction is comparable to that of the petitioner in Bond. Just as "no speaker in natural parlance would describe Bond's feud-driven act of spreading irritating chemicals on [her rival's] door knob and mailbox as 'combat,' " *id.* at 2090, Hale contended that his actions were similarly far removed from the type of conduct targeted by § 175. The Court disagreed. Hale did not spread "irritating chemicals" on a door knob. Rather, he mailed a substance purporting to contain a virus that, according to expert testimony at trial, causes a "very severe disease" and is fatal in approximately half of all cases. Inhalation of hantavirus causes the lungs to fill with fluid, leading to severe acute respiratory distress syndrome. The virus is not directly treatable, and thus individuals who are exposed are typically only given supportive care. Although testimony reflected that hantavirus has not been used for terrorist activity in this country, an epidemiologist testified that the virus potentially could be used for such activities, and that it is considered a Class Three agent in the four-level classification of "bioterrorism type" agents. *United States v. Hale*, 762 F.3d 1214, 1224-26 (10th Cir. 2014).

The facts in *Hale* are instructive. In retaliation against an official's discharge of her duties as an officer of the court, Hale claimed to send a deadly virus through the mail. Unlike the plot at issue in *Bond,* such conduct is in natural parlance referred to as terrorism. *See, e.g., United States v. Keyser,* 704 F.3d 631, 635 (9th Cir. 2012) (sending packets of sugar labeled "Anthrax" was "feign[ing] multiple acts of biological terrorism"); *United States v. Chapple,* 251

Fed.Appx. 553, 559 (10th Cir. 2007) (unpublished) (referring to such mailings as "terror-related threats"). Similar to the present case, in his supplemental brief, Hale underplayed the gravity of his charge, discussing the ramifications of sending "a baggie of mouse droppings" in the mail. However, taking the evidence in the light most favorable to the government, Hale perpetrated a hoax that, had it involved the virus it was purported to involve, would have been covered by § 175 even in light of the Supreme Court's guidance in *Bond*. *United States v. Hale*, 762 F.3d 1214, 1226 (10th Cir. 2014) *cert. denied*, 135 S. Ct. 1464 (2015)

Finally, petitioner, citing the *Bond* case addresses the constitutionality issue missing from *Bond*. Dutschke obviously agrees with the decision in the *Bond* case, and argues that in the nearly identical statute (§ 175) and Convention (the Biological Weapons Convention), the parallel arguments easily lead to the conclusion that an entirely domestic prosecution of a violation of the Biological Weapons Convention is beyond the reach of treaty power and is, without question, a gross failure of Constitutional justice. While in no way binding precedent, the District Court in the Northern District of Ohio, in Levendaris, provided reasonable analysis on this point, stating when on September 29, 2014, the district court denied the post-trial motion for acquittal that ricin is "just the sort of toxin the [Biological Weapons Convention] sought to address, and is fundamentally different from the chemicals at issue in *Bond*, and does have the potential to cause mass suffering, even if not of high-grade quality." The Court also observed that ricin "is similar to the substances in cases the Supreme Court cited favorably in *Bond* as falling within the government's authority to prosecute under § 229." Likewise the Court held that the fact that "Defendant may not have executed his plan or been likely to successfully injure with his homemade blend of ricin is of no consequence." The petitioner in the present case went on to make specious jurisdictional arguments that he claims should have been raised by his

attorney, such as arguing that 18 U.S.C. § 175 does not confer domestic jurisdiction.  Dutschke is a national of the United States, and the President, Senator, and Judge targeted by Dutschke are also nationals of the United States.  The ricin was produced in the United States, and it was mailed within the United States.  There is no issue regarding jurisdiction.  In short, Dutschke has raised no claims that pass muster under either prong of Strickland.  His counsel did not fall below any acceptable standards in his representation and in fact, successfully negotiated a deal for 25 years in a case that could have netted a life sentence, as well as garnering a concurrent 18 year sentence for a state child molestation case that could have netted 45 years to be served day for day in state custody consecutive to the federal sentence.  Likewise, Dutschke was not actually prejudiced by any alleged errors he attributes to his trial counsel.

## V.  <u>CONCLUSION</u>

For the foregoing reasons, the defendant's motion to vacate, set aside, or correct sentence should be denied in its entirety.

**RESPECTFULLY SUBMITTED,** this the 10th day of July, 2015.

FELICIA C. ADAMS (MS Bar No. 1049)
United States Attorney


By:  *s/Clay Joyner*
CLAY JOYNER (MS Bar No. 10316)
Assistant United States Attorney
900 Jefferson Avenue
Oxford, MS  38655-3608
Telephone:  662.234.3351
Facsimile:    662.234.0657 (Criminal Div.)

## <u>CERTIFICATE OF SERVICE</u>

I, CLAY JOYNER, Assistant United States Attorney for the Northern District of Mississippi, hereby certify that I electronically filed the foregoing with the Clerk of the Court using the ECF system which sent notification of such filing to the following:

Kenneth Coghlan, Esq.
**RAYBURN COGHLAN LAW FIRM, PLLC**
Post Office Drawer 1360
Oxford, MS 38655
*kcoghlan@rayburnlaw.com*

and I hereby certify that I have mailed by United States Postal Service the document to the following non-ECF participants:

James Everett Dutschke
15536-042 USP Max
Post Office Box 8500
Florence, CO 81226-8500

**THIS** the 10th day of July, 2015.

 *s/Clay Joyner*
CLAY JOYNER
Assistant United States Attorney